NISSHO IWAI AMERICAN CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4598-85.          Filed October 8, 1987.

*Steven Kamerman* and *Jerome Kamerman*, for the petitioner.[1]

*Anne Hintermeister*, for the respondent.

JACOBS, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

| FYE Mar. 31— | Amount of Deficiency[2] |
|---|---|
| 1980 | $183,457 |
| 1981 | 439,808 |

Respondent twice increased the deficiency amount in two amended answers to the petition filed herein. The total deficiency now claimed is $438,180 for the fiscal year ended March 31, 1980, and $466,531 for the fiscal year ended March 31, 1981.

---

[1]Edward C. Rustigan, Joel V. Williamson, and Thomas C. Durham, filed a brief and reply brief on behalf of the American Bankers Association and Continental Illinois Corp. as amici curiae.

[2]All amounts are rounded to the nearest dollar.

Petitioner filed an amendment to its petition, claiming an overpayment of $1,850,956 for the fiscal year ended March 31, 1980.

This case concerns the amount of foreign tax credit, if any, which may be claimed with respect to Brazilian taxes withheld on interest income received by petitioner as a result of a loan to a Brazilian borrower. The borrower was contractually obligated to absorb all Brazilian taxes required to be paid with respect to the interest income (i.e., petitioner was to receive the interest free of all Brazilian taxes). During the years involved, the borrower received a subsidy from the Brazilian Government equal to a percentage of the taxes withheld.

The issues to be resolved are: (1) Whether petitioner is legally liable for Brazilian withholding taxes paid by the Brazilian borrower; and if so, then (2) whether such subsidy reduces the amount of the foreign tax credit allowable to petitioner pursuant to section 901;[3] and (3) whether petitioner is entitled to a foreign tax credit with respect to withholding taxes, if any, on interest received on funds deposited by the Brazilian borrower with the Banco Central do Brasil pursuant to Brazilian Resolution No. 432.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Nissho Iwai American Corp. (hereinafter referred to as petitioner or NIAC) is a corporation organized and existing under the laws of the State of New York. Its principal place of business at the time of the filing of the petition herein was in New York City.

Petitioner is a wholly owned subsidiary of Nissho Iwai Corp. (hereinafter referred to as NIC), a Japanese corporation. NIC is a large trading company, having numerous subsidiaries and branches.

During the years in issue, petitioner was engaged in the business of importing and exporting a wide variety of products, including metals and metal products, machinery,

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

textiles, lumber, chemicals, foodstuffs, fuels, and general merchandise. It also engaged in making loans in the United States and abroad.

On January 27, 1978, petitioner entered into a loan agreement with Companhia Nipo-Brasileira de Pelotizacao-Nibrasco (hereinafter referred to as Nibrasco), a corporation organized and existing under the laws of the Federal Republic of Brazil.[4] The loan agreement provided that NIAC would lend Nibrasco $20 million dollars U.S. (the loan) on or before February 17, 1978 (the remittance date). Nibrasco agreed to repay the principal of the loan in six semi-annual installments, the first of which was due 30 months from the remittance date, and the last of which was due 60 months from the remittance date. The amount of the first installment was $3.5 million and the amount of each of the remaining five installments was $3.3 million.

The loan agreement provided that Nibrasco would pay interest semi-annually; the first interest payment was due 6 months after the remittance date. The rate of interest fluctuated; it was based on the rate quoted to the Industrial Bank of Japan, Ltd., London Branch, for the offering of dollars by prime banks in the London interbank eurodollar market for deposit for the applicable 6-month period.

All payments of principal and interest were to be made by means of telegraphic transfer to NIAC's bank account in New York, in U.S. dollars. All payments of principal and interest were to be free and clear of, and without deduction for, any taxes imposed by Brazil.

The loan was subject to the approval of the Brazilian Government and the obtaining of a certificate of registration by the Banco Central do Brasil (hereinafter referred to

---

[4]Nibrasco is engaged in the business of producing and selling iron ore pellets. Its stock is owned by the following entities:

| Name | Percentage of stock ownership |
| --- | --- |
| Companhia Vale do Rio Doce | 51.00 |
| Six Japanese steel companies | 48.00 |
| NIC | 0.98 |
| Brazilian affiliates of NIC and the six Japanese steel companies | Less than a 10th of 1% |
| Other persons not affiliated with the above | Less than a 10th of 1% |

Most of the iron ore pellets sold by Nibrasco are sold to the six Japanese steel companies through NIC pursuant to 15-year output contracts. The purpose of the loan was to finance construction of iron ore pellet plants; the loan was guaranteed by the six Japanese steel companies.

as the Central Bank).[5] Nibrasco also agreed to pay NIAC an administration fee of $200,000 within 10 days after the issuance of the certificate of registration. On February 17, 1978, NIAC caused $20 million to be transferred to Nibrasco's Brazilian bank. The U.S. dollars were subsequently converted into Brazilian currency.

The Central Bank issued a registration certificate with respect to the loan on March 31, 1978. Nibrasco timely paid the administration fee, as well as all required installments of principal and interest.

Brazil imposes a 25-percent withholding tax on interest paid by Brazilian borrowers on loans to foreign entities. Foreign loans to Brazilian borrowers fall into two categories—gross loans and net loans. The difference between a gross loan and a net loan is that in the former the quoted interest rate is a gross rate which does not guarantee the lender a fixed rate of return after deduction of the withholding tax, whereas in the latter, the interest quoted is net of the withholding tax. Because of this difference, most of the foreign loans made to Brazilian borrowers during the years in issue were net loans, as was the NIAC-Nibrasco loan.

Evidence of payment of the withholding tax is a precondition for the payment of interest to a foreign lender.[6] Under Brazilian law, payment of the tax is made by submitting a Documento de Arrecadacao de Receitas Federais (hereinafter referred to as a DARF) and the amount of tax to a Brazilian bank.

Nibrasco maintained a bank account at Banco America de Sul, S.A. (hereinafter referred to as the bank). For each interest payment made to NIAC during the years in issue, Nibrasco prepared a DARF indicating the amount of the interest payment and the 25-percent withholding tax due

---

[5]Brazil imposes restrictions on the receipt and exchange of foreign currency. By law, all foreign currency loans must be appproved and registered with the Central Bank. Once prior approval for the loan is obtained, the funds are remitted in foreign currency by the lender to the borrower via a bank in Brazil where the foreign currency is converted into Brazilian currency by means of an exchange contract. Pursuant to the exchange contract, the borrower "sells" the foreign currency to the Brazilian bank for Brazilian currency at the official rate of exchange periodically set by the Central Bank. To effect payment of interest and principal on the payment date the borrower must "purchase" the foreign currency from a Brazilian bank at the official rate of exchange and the Brazilian bank then makes such payment to the lender. The certificate of registration permits the borrower to "purchase" the foreign currency.

[6]The borrower cannot purchase foreign currency and remit it to the lender without establishing that the withholding tax has been paid.

thereon and submitted it to the bank. Thereafter, the bank debited Nibrasco's account for the amount of tax due.

On July 31, 1975, Brazilian Decree-Law No. 1411 was issued which inter alia granted the National Monetary Council[7] authority to reduce the income tax on interest paid to non-Brazilian persons or to grant a monetary benefit (i.e., a subsidy) to the Brazilian borrower. The subsidy is payable only when payment of income tax on the interest is "actually made, and never in an amount higher than the collected tax." Pursuant to Decree-Law No. 1411, on August 5, 1975, a subsidy was granted to certain borrowers (including Nibrasco) equal to 85 percent of the income tax withheld.[8] The amount of the subsidy was reduced from 85 percent to 50 percent, effective July 27, 1979, and remained at 50 percent until December 9, 1979. From December 10, 1979, to May 12, 1980, the amount of the subsidy was 95 percent. From May 13, 1980, to June 30, 1985, the amount of the subsidy was 40 percent until its elimination on July 1, 1985.

The Brazilian borrower (here, Nibrasco) automatically receives a credit from his bank (i.e., the tax-collecting bank) in the amount of the subsidy at the time of payment of the withholding tax; however, the credit is subject to the approval of the Central Bank. Mechanically, the tax-collecting bank credited the account of the National Treasury for the entire tax due and simultaneously debited (reduced) the account of the National Treasury for the amount of the subsidy. The effect of this accounting procedure was that the National Treasury was credited only with the amount by which the withholding tax exceeded the subsidy.

During the years in issue, the payments made and received by NIAC and Nibrasco, and NIAC's treatment of the transaction for Federal tax purposes, were as follows:

---

[7] The National Monetary Council is a Government agency responsible for economic programs. It acts through the Central Bank.

[8] On Oct. 24, 1974, Brazilian Decree-Law No. 1351 was issued which permitted the National Monetary Council to reduce temporarily the withholding income tax due on interest payable to foreign creditors. On the same day (i.e., Oct. 24, 1974), the National Monetary Council decided to temporarily reduce from 25 percent to 5 percent the withholding income tax on interest on loans registered at the Central Bank. On Aug. 5, 1975, the National Monetary Council revoked this temporary withholding income tax reduction. We recognize that on the same date (Aug. 5, 1975), the withholding tax reduction was revoked (which had the effect of increasing the withholding tax) and a Government subsidy to the borrower was instituted.

| (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|
| | | | Amount of income | | |
| Date of interest payment | Amount received by NIAC | Amount of withholding tax collected | reported on NIAC's tax returns | Percentage of subsidy | Amount of subsidy to Nibrasco |
| 8/17/79 | $1,225,520 | $408,466 | $1,633,986 | 50% | $204,233 |
| 2/17/80 | 1,265,000 | 421,624 | 1,686,624 | 95 | 400,543 |
| 8/17/80 | 1,605,138 | 534,992 | 2,140,131 | 40 | 213,997 |
| 2/17/81 | 1,012,000 | 288,693 | 1,300,683 | 40 | 115,477 |

Note: Column (4) equals column (2) plus column (3);
     Column (6) equals column (3) multiplied by column (5).

Because of the historically high inflation in Brazil and the resulting periodic currency exchange devaluations, the National Monetary Council on June 23, 1977, by Central Bank Resolution No. 432, authorized borrowers of registered foreign currency loans to hedge cruzeiros[9] (intended to be used for payments on the loans) against currency exchange devaluations by depositing foreign funds at the borrower's Brazilian bank. Pursuant to Resolution No. 432, the borrower may purchase the foreign funds to be deposited at its Brazilian bank at the current official exchange rate. The foreign funds remain on deposit until such time as the borrower is required to make payment to the lender. The foreign currency deposited at the borrower's bank is then transferred to the Central Bank which pays (2 days prior to the date the borrower must make a payment to the lender) interest on the deposited funds at a rate equal to that payable by the Brazilian borrower to the foreign lender (as set forth in the certificate of registration). To the extent that interest is paid to the foreign lender with funds deposited in the Central Bank, the Brazilian borrower has no obligation to withhold income taxes thereon; correspondingly, the Brazilian borrower receives no subsidy.

During petitioner's taxable year ended March 31, 1981, Nibrasco deposited funds with the Central Bank pursuant to Resolution No. 432. During the term of this deposit, petitioner received interest payments, which it claims were net of $48,650 in withholding of taxes. In its income tax return for the taxable year ended March 31, 1981, petitioner did not include the $48,650 as additional interest income,

---

[9]The Brazilian currency at that time. The new Brazilian currency is cruzados.

nor did it claim a foreign tax credit for the $48,650. Petitioner now claims entitlement to an additional $48,650 of foreign tax credit.[10]

In the notice of deficiency, respondent reduced the amount of claimed foreign tax credit for both years in issue by 85 percent, except for the foreign tax credit claimed with respect to the August 17, 1979, payment which respondent allowed under the grandfather clause set forth in Rev. Rul. 78-258, 1978-1 C.B. 239, 241.[11] Respondent disputes petitioner's entitlement to the additional $48,650 of foreign tax credit. By the amendments to his answer to the petition, respondent seeks increased deficiencies claiming that none of the Brazilian foreign tax credits are allowable because petitioner was not legally liable for the Brazilian tax.[12]

## OPINION

At the outset, it should be noted that this case involves the unusual situation in which a taxpayer seeks to recognize

---

[10]Petitioner acknowledges that if the $48,650 credit is allowable, it must also increase its income by $48,650.

[11]Rev. Rul. 78-258 provides that the amount allowable as a foreign tax credit with respect to the Brazilian withholding tax is limited to the amount by which the Brazilian withholding tax credit exceeds the subsidy paid to the Brazilian borrower. That revenue ruling expressly modified Rev. Rul. 57-106, 1957-1 C.B. 242. Because of such modification, Rev. Rul. 78-258 provided: "the conclusion in this Revenue Ruling will not be applied to disallow a foreign tax credit for amounts claimed as income taxes imposed by Brazil on interest accrued or received (but not prepaid) prior to January 1, 1980, with respect to loans made prior to March 16, 1978 [herein referred to as the grandfather clause]."

The loan involved herein was made prior to Mar. 16, 1978. Respondent allowed a foreign tax credit with respect to the Aug. 17, 1979, interest payment; he disallowed the credit for the tax with respect to interest paid for the period Aug. 18, 1979, through Dec. 31, 1979. The amount of interest accrued for this period was $941,875, and the amount of Brazilian withholding tax was $313,958. With respect to the August-December 1979 period, respondent contends that "while the wording of the Revenue Ruling [grandfather clause] is ambiguous, it is apparent that respondent's intention was to exempt only Brazilian taxes due on payments of interest which were due prior to January 1, 1980. Although interest accrued daily from August 17, 1979 in an economic sense, no part of the interest was due until February 17, 1980 and no tax was due under Brazilian tax law until there was a payment of interest."

[12]In his notice of deficiency, respondent disallowed 85 percent of the foreign tax credit claimed by petitioner for Brazilian withholding tax paid after Jan. 1, 1980. In the first amendment to his answer to the petition, respondent increased the disallowance from 85 percent to 95 percent of the foreign tax credit claimed by petitioner for the withholding tax paid from Jan. 1, 1980 to Mar. 31, 1980. In the second amendment to his answer, respondent disallowed the entire amount of the foreign tax credit claimed with respect to the withholding tax.

When respondent disallowed the credit for the withholding tax, he concomitantly reduced petitioner's taxable income by the amount of the withholding tax disallowed. Petitioner does not dispute this concomitant reduction in its taxable income, and petitioner concedes that if the Brazilian withholding tax claimed as a foreign tax credit is allowable, in part or in full, then the concomitant reduction to its taxable income should also be reduced. Petitioner also concedes certain other adjustments.

income. The reason for this is because attached to the recognition of income is the potential availability of a foreign tax credit; and taxwise, the foreign tax credit is worth more than the detrimental recognition of the income.

Section 901 allows a domestic corporation to claim as a credit against its Federal income tax (subject to certain limitations not applicable herein) the amount of any income taxes paid on behalf of the taxpayer to a foreign country. Sec. 4.901-2(a), Temporary Income Tax Regs., 45 Fed. Reg. 75647 (Nov. 17, 1980).[13]

Petitioner claimed a credit for the entire amount of Brazilian withholding tax. In his notice of deficiency, respondent disallowed 85 percent of the claimed credit. Subsequent to the issuance of the notice of deficiency, respondent became aware that the amount of the subsidy had been changed on several occasions during the years in issue. To reflect such changes, respondent claimed an increased deficiency with respect to fiscal year ended March 31, 1980, in his first of two amended answers to the petition. In the second amended answer, respondent asserted that the entire credit claimed should be disallowed. Respondent's latest position is based on statements made at trial by his expert witness that legal liability to pay the withholding tax is imposed on the Brazilian borrower (i.e., Nibrasco) rather than on the lender (i.e., petitioner).

A foreign tax is creditable only if the taxpayer is legally liable under foreign law for the tax. Sec. 4.901-2(g), Temporary Income Tax Regs. However, legal liability for a tax and the obligation to pay the tax are not necessarily the same. For example, under a withholding system, legal liability for the tax and the obligation to pay the tax are different. The Federal wage withholding system illustrates this difference—the employer is the person obligated to withhold the tax and to pay the withheld tax to the Government; the employee is the person legally liable for the tax.

---

[13]In November 1980, the Internal Revenue Service issued temporary regulations which set forth requirements for, and limitations on, the amount of foreign tax credit. These temporary regulations, sec. 4.901-2 et seq., generally were made applicable to taxable years ending after June 15, 1979. Final regulations under sec. 901 were made effective for taxable years beginning after Nov. 14, 1983.

Under Brazilian law, interest paid to foreign lenders (i.e., lenders residing or domiciled abroad) is subject to an income tax at the rate of 25 percent. The Brazilian borrower is required to withhold that percentage from each payment of interest; as a practical matter, the interest payment cannot be made unless and until the Brazilian withholding tax is paid. Respondent argues that the Brazilian withholding tax is a tax upon the payment, rather than receipt, of interest. We disagree.

U.S. tax law is the standard for deciding whether a foreign levy is a creditable income tax. *Biddle v. Commissioner*, 302 U.S. 573 (1938). After reviewing translations of the applicable Brazilian law, it is our opinion that the tax is on the receipt of the interest. The tax is imposed on the foreign lender; the Brazilian borrower is simply the person required to pay the tax on behalf of the foreign lender. Accordingly, we believe that the Brazilian withholding tax per se is potentially creditable to the lender. See sec. 4.901-2(a), Temporary Income Tax Regs.; *Gleason Works v. Commissioner*, 58 T.C. 464 (1972).[14] We now turn to the amount of the Brazilian withholding tax which is creditable.

Section 4.901-2(f), Temporary Income Tax Regs. (relating to the amount of income tax paid or accrued), provides:

(f) *Amount of income tax paid or accrued*—(1) *In general*. A credit is allowed under section 901 for the amount of income tax (within the meaning of sec. 4.901-2(a)(1)[15] that is paid or accrued to a foreign

---

[14]Respondent has taken the same position in Rev. Rul. 70-49, 1970-1 C.B. 158.

[15]Sec. 4.901-2(a)(1) provides:

(a) *Definition of income, war profits, or·excess profits tax*—(1) *In general*. Section 901 allows a credit for the amount of any income, war profits, or excess profits tax ("income tax") paid or accrued by or on behalf of the taxpayer to any foreign country. Whether a charge imposed by a foreign country ("foreign charge") is an income tax is determined independently for each separate foreign charge. Each separate foreign charge will be considered either to be an income tax or not to be an income tax, in its entirety, for all persons subject to the charge. The standard for determining whether a foreign charge is an income tax is the U.S. income tax. Thus, a foreign charge is an income tax if and only if—

(i) The charge is not compensation for a specific economic benefit within the meaning of paragraph (b) of this section;

(ii) The charge is based on realized net income within the meaning of paragraph (c) of this section; and

(iii) The charge follows reasonable rules regarding source of income, residence, or other bases for taxing jurisdiction.

A foreign charge may meet these requirements even if the provisions of the law of the foreign country ("foreign law") imposing the charge differ substantially from the income tax provisions of the Internal Revenue Code. A foreign charge does not follow reasonable rules of

country, subject to the provisions of this paragraph (f). The amount of income tax paid or accrued is determined separately for each taxpayer.

\* \* \* \* \* \* \*

(3) *Subsidies*—(i) *General rule.* An amount is not income tax paid or accrued to a foreign country to the extent that—

(A) The amount is used directly or indirectly by country to provide a subsidy by any means (such as through a refund or credit) *to the* taxpayer; and

(B) The subsidy is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer.

(ii) *Indirect subsidies.* A foreign country is considered to provide a subsidy to a person if the country provides a subsidy to another person that—

(A) Is owned or controlled, directly or indirectly, by the same interests that own or control, directly or indirectly, the first person; or

(B) Engages in a business transaction with the first person, but only if the subsidy received by such other person is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the first person with respect to such transaction.

[45 Fed. Reg. 75653-75654 (Nov. 17, 1980).]

Respondent contends that if petitioner is legally liable for the Brazilian tax, that portion of the tax which was returned to Nibrasco by way of the subsidy is not creditable. Respondent relies on section 4.901-2(f)(3), Temporary Income Tax Regs., for this position. Petitioner argues that this regulation is invalid and requests that we follow what have been termed the "Mexican railroad car rental" cases, e.g., *Missouri Pacific R.R. Co. v. United States*, 204 Ct. Cl. 837, 497 F.2d 1386 (1974); *Chicago Burlington & Quincy Railroad Co. v. United States*, 197 Ct. Cl. 264, 455 F.2d 993 (1972), revd. on other grounds 412 U.S. 401 (1973); *Missouri Pacific R.R. Co. v. United States*, 301 F. Supp. 839 (E.D. Mo. 1967), affd. in part and revd. in part on other grounds 411 F.2d 327 (8th Cir. 1969); *Missouri-Illinois R.R. Co. v. United States*, 180 Ct. Cl. 1179, 381 F.2d 1001 (1967). We agree with respondent.

The temporary regulations in effect during both years in issue provide that, for purposes of creditability, amounts of tax paid or accrued to a foreign country do not include

taxing jurisdiction if liability for the charge is clearly related to the availability of a credit for the charge against income tax liability to another country.

[45 Fed. Reg. 75648 (Nov. 1980).]

amounts used directly or indirectly as a subsidy to either the taxpayer or a person who is engaged in a business transaction with the taxpayer where the subsidy is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer. Here, the amount of the subsidy received by Nibrasco is clearly based on the amount of the withholding tax.

These regulations were promulgated under the Treasury's general rule-making power as authorized by section 7805(a). As stated by the Supreme Court, Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948), and they "should not be overruled except for weighty reasons." *Bingler v. Johnson*, 394 U.S. 741, 750 (1969). We recognize that the regulations involved are temporary, not final, regulations; nevertheless, we believe that they are entitled to the same weight as the final regulations.[16] See *Zinniel v. Commissioner*, 89 T.C. 357 (1987).

The position set forth in the temporary regulations, in our opinion, is not unreasonable. The purpose of the foreign tax credit is to reduce international double taxation. See *American Chicle Co. v. United States*, 316 U.S. 450 (1942). Here, no double taxation occurred; in fact, because petitioner's loan with Nibrasco was a net loan, petitioner was not "out of pocket" for any of the Brazilian taxes. As far as petitioner is concerned, its receiving credit for the Brazilian taxes in any amount essentially constitutes a windfall. The question to be resolved is how much of a windfall petitioner is to receive.

Here, Nibrasco absorbed the entire amount of the Brazilian withholding tax on behalf of petitioner. Simultaneous with the payment of the tax, Nibrasco received a subsidy from the Brazilian Government based on the amount of tax paid. Petitioner argues that an amount collected as a tax does not "lose its status as such by virtue of the fact that the taxing authority (foreign or domestic) allocates that amount to a specific program." While in general we agree

---

[16]It is to be noted that the final regulations (Treas. Reg. sec. 1.901-2(e)(3)) provide that a subsidy accorded in connection with foreign taxes reduces the creditability of such taxes.

with petitioner's argument, in the situation involved herein, payment of the tax and receipt of the subsidy are in lockstep. Commonsense dictates that payment of the tax and receipt of the subsidy be viewed together in determining the amount of foreign taxes creditable for purposes of section 901. If we accept payment of the Brazilian tax as one transaction and receipt of the subsidy as another, we would ignore the true unity of the transaction and elevate form over substance; this we shall not do.

The Mexican railroad car rental cases, which predated the temporary regulations, held that a Mexican withholding tax imposed on freight car rentals was creditable, notwithstanding the granting of a subsidy by Mexico to the Mexican railroad company in an amount equal to the tax withheld. We believe that the years have sapped such decisions of whatever vitality they may have had; accordingly we decline to follow the holdings of those cases.[17]

Were it not for the grandfather clause set forth in Rev. Rul. 78-258, we would reduce the credit for the Brazilian withholding tax for both years in issue to the extent of the subsidy received by Nibrasco. However, the grandfather clause states that "the conclusions in this Revenue Ruling (Rev. Rul. 78-258) will not be applied to disallow a foreign tax credit for amounts claimed as income tax imposed by Brazil on interest accrued or received (but not prepaid) prior

---

[17]We note that sec. 1204 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2532, codifies the position set forth in the temporary and final regulations. The applicable Senate Finance Committee report provides:

"A Treasury regulation denies a foreign tax credit for foreign taxes used directly or indirectly as a subsidy to the taxpayer. Absent this rule, the Treasury would, in effect, bear the cost of tax subsidy programs instituted by foreign countries for the direct or indirect benefit of their residents and certain nonresidents. The committee is informed that some U.S. lenders and other U.S. taxpayers take tax return positions that are inconsistent with this rule. The committee does not believe that foreign tax credits should be allowed for foreign taxes which, while ostensibly borne by a U.S. taxpayer, are effectively rebated by the levying country by means of a government subsidy to the taxpayer, a related party, a party to a transaction with the taxpayer, or a party to a related transaction. To eliminate any uncertainty in this area, the committee believes that the Treasury regulation rule disallowing foreign tax credits for taxes used as a subsidy should be clarified and codified. [S. Rept. 99-313, at 307 (1986), 1986-3 C.B. (Vol. 3) 307.]"

The Senate Finance Committee report also states:

"The committee is aware that the validity under current law of a ruling predating Treas. Reg. sec. 1.901-2(e)(3) that embodies its substance is being challenged in litigation pending in the U.S. Tax Court. No inference should be drawn from the committee's action as to the validity or invalidity of the regulation or ruling for years prior to the effective date of the bill [foreign taxes paid or accrued in taxable years beginning after December 31, 1986]. [S. Rept 99-313, at 325 (1986), 1986-3 C.B. (Vol. 3) 325."

to January 1, 1980, with respect to loans made prior to March 16, 1978." We do not believe this language to be ambiguous, as respondent contends. We understand the meaning of the grandfather clause to be that respondent has conceded creditability for the entire amount of Brazilian withholding tax paid with respect to interest accrued or paid prior to January 1, 1980, without reduction for any subsidy received by the Brazilian borrower. The public has a right to rely on positions taken by the Internal Revenue Service in published revenue rulings. Having made a concession in Rev. Rul. 78-258, we believe respondent should be so bound.

Respondent concedes that petitioner is entitled to full credit for the foreign tax paid with respect to the August 17, 1979, interest payment. Further, he admits that interest accrued, in an economic sense, daily from August 17, 1979, to December 31, 1979. The amount of interest accrued from August 18, 1979, through December 31, 1979, is $941,875; the amount of Brazilian withholding tax on such interest is $313,958. In view of the grandfather clause, we find that petitioner is entitled to full credit for the $313,958 without reduction for the subsidy paid to Nibrasco with respect thereto. With respect to the credit for the Brazilian withholding taxes paid on interest accruing after December 31, 1979, we find that such credit is to be reduced by the amount of the subsidy paid to Nibrasco.

We now turn to whether petitioner is entitled to a foreign tax credit with respect to interest on funds deposited by Nibrasco pursuant to Brazilian Resolution No. 432. The record in this case does not indicate what amount of Brazilian tax, if any, was withheld by the Central Bank on behalf of petitioner. In fact, the only evidence in this regard was testimony by respondent's expert witness that the Central Bank had no duty to withhold, and did not withhold, such tax on behalf of petitioner. The burden of proof with respect to this issue is on petitioner; it has failed to carry such burden. See Rule 142(a). Accordingly, we hold that petitioner is not entitled to a foreign tax credit with respect to interest on funds deposited with the Central Bank of Nibrasco pursuant to Brazilian Resolution No. 432.

To reflect the foregoing and concessions by the parties,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, GERBER, WRIGHT, PARR, WILLIAMS, and WELLS, *JJ.*, agree with this opinion.

SWIFT, *J.*, did not participate in the consideration of this case.